**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SCOTT STEIN<br>4373 Mahogany Ridge Drive<br>Weston, FL 33331 | : | JURY TRIAL DEMANDED |
| and | : | |
| INTELLECTUAL PROPERTY<br>RISK RESOURCES, INC.<br>1112 Weston Road #220<br>Weston, FL 33326 | : | CIVIL ACTION NO. |
| and | : | |
| INTELLECTUAL PROPERTY<br>PARTNERS, INC.<br>1112 Weston Road #220<br>Weston, FL 33326 | : | |
| vs. | : | |
| VENTURE PROGRAMS, INC.<br>1301 Wright's Lane East<br>West Chester, PA 19380 | : | |
| and | : | |
| PHILIP J. HARVEY<br>743 Providence Road<br>Malvern, PA 19355 | : | |
| and | : | |
| TARA HARVEY BRAMWELL<br>203 Monument Avenue<br>Malvern Pa., 19355 | : | |
| and | : | |
| THE HARVEY FAMILY PARTNERSHIP<br>743 Providence Road<br>Malvern, PA 19355 | : | |

**COMPLAINT**

**PARTIES**

1. Plaintiff Scott Stein ("Mr. Stein") is an adult individual who resides at 4373 Mahogany Ridge Drive, Weston, Florida 33331. At all times relevant herein, Mr. Stein has been an officer and shareholder of Plaintiffs Intellectual Property Risk Resources, Inc. and Intellectual Property Partners, Inc, which were both founded by Mr. Stein to further create, develop, refine, enhance and distribute a suite of unique and proprietary intellectual property insurance programs developed by Mr. Stein.

2. Plaintiff Intellectual Property Partners, Inc. ("IPPI") is a Florida corporation with its principal place of business at 1112 Weston Road Number 220, Weston, Florida 33326.

3. Plaintiff Intellectual Property Risk Resources, Inc. ("IPRR") is a Florida corporation with its principal place of business at 1112 Weston Road Number 220, Weston, Florida 33326.

4. Defendant Philip J. Harvey ("Mr. Harvey") is an adult individual who resides at 743 Providence Road, Malvern, Pennsylvania 19355. Mr. Harvey is the Chairman, President and Managing Director of Defendant Venture Programs, Inc. and a partner in Defendant the Harvey Family Partnership.

5. Defendant Tara Harvey Bramwell ("Ms. Harvey" or "Tara Harvey") is an adult individual who resides in Malvern, Pennsylvania. Ms. Harvey is the daughter of Philip Harvey. Ms. Harvey is a senior executive of Defendant Venture Programs, Inc. and, upon information and belief, a partner in Defendant the Harvey Family Partnership. When referred to jointly with her father Philip Harvey, they are referred to as "the Harveys."

6. Defendant Venture Programs, Inc. ("VP") is a Pennsylvania corporation with its principal place of business at 1301 Wright's Lane East, West Chester, PA 19380.

7. Defendant, the Harvey Family Partnership ("the HFP"), is a Pennsylvania General Partnership. On information and belief, the HFP's principal place of business is at 743 Providence Road, Malvern, Pennsylvania 19355.

**JURISDICTION**

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiffs are all Florida citizens and Defendants are all Pennsylvania citizens and the matter in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this Complaint occurred in this District and the defendants reside in this District.

**SUMMARY OF ACTION**

10. This Complaint is filed by Plaintiffs against Defendants for their willful and malicious scheme to misappropriate Plaintiffs' proprietary and confidential suite of intellectual property insurance programs. In essence, the Defendants entered into confidentiality agreements in various forms to learn about Plaintiffs' proprietary property. Upon realizing the value of that property, the defendants then fraudulently induced the Plaintiffs to enter into a series of contractual relations in order to wrongfully misappropriate Plaintiffs property and convert it for their own use and benefit. Plaintiffs seek compensatory and punitive damages against the Harveys, VP, and the HFP necessary to punish and deter them from defrauding others in their business.

**FACTUAL BACKGROUND**

11. In or around 1993, Mr. Stein began working in the sales and marketing of insurance programs. From 1993 through approximately 2000, Mr. Stein obtained extensive insurance brokerage experience specializing in professional liability coverages, with an emphasis on the highly specialized subject of intellectual property insurance.

12. During this period, Mr. Stein identified significant voids in the breadth of coverages offered to insureds by the then currently available intellectual property insurance programs, as well as the lack of adequate tools and methods for underwriters to comprehensively model intellectual property underwriting risk so as to remove the common problem of adverse selection that underwriters most often faced in evaluating the applications for cover that they received.

13. Based on his experience in the insurance industry, Mr. Stein, in the late-1990's, embarked on developing a suite of unique and proprietary intellectual property insurance products unparalleled in the industry. This suite of unique and proprietary products was complemented by proprietary underwriting mechanisms designed by Mr. Stein to filter risks effectively for underwriters by greatly increasing the probability of removing the adverse selection factor.

14. Through an enormous effort of time and expenditure of money, Mr. Stein developed both intellectual property insurance products, as well the underwriting tools, approaches, techniques and methodologies for such intellectual property insurance. (Mr. Stein's development is hereinafter referred as "the IP Insurance Program." The IP Insurance Program was designed to become the leading intellectual property insurance program to provide coverage for patents, trademarks, copyrights and trade dress.

15. The IP Insurance Program developed by Mr. Stein incorporated concepts, levels of coverage and approaches toward risk analysis which had never before been employed in the intellectual property insurance industry.

16. At the time Mr. Stein developed the IP Insurance Program, no other insurance program offered the same degree of coverage or utilized the IP Insurance Programs' underwriting analysis approach.

17. In or around February 2000, Mr. Stein incorporated IPPI and became the sole shareholder in order to further refine and distribute the IP Insurance Program.

18. After incorporating IPPI, Mr. Stein, on behalf of IPPI, commenced significant efforts to develop multiple markets for the IP Insurance Program. Mr. Stein developed and maintained relationships in the insurance industry by conducting extensive marketing activities, identifying and arranging meetings with major corporations and by networking and mining contacts among intellectual property attorneys, intellectual property risk assessment and valuation organizations, and venture capital firms on behalf of IPPI.

19. In or around February 2000, at the time IPPI was formed, IPPI decided to explore forming relationships with third parties to distribute and market the IP Insurance Program, and to raise $200,000 to $300,000 of capital. At this time, IPPI began searching for third parties with the requisite resources.

20. Mr. Stein learned through an individual named Stephen G. Gray ("Mr. Gray") that Defendants were involved in the insurance industry and that Mr. Harvey desired to expand his business ventures through the distribution of new insurance products.

21. In or around February 2000, Mr. Gray introduced Messrs. Stein and Harvey. Prior to their

introduction, neither the Harveys, the HFP nor VP had any experience or involvement in intellectual property insurance. VP's business was primarily focused on providing other lines of insurance coverage to both golf and country clubs and to technology companies.

22. Upon information and belief, based upon discussions Mr Harvey had with Mr. Gray and their knowledge of the insurance industry, Mr. Harvey became aware of the significant profit potential of the IP Insurance Program developed by Mr. Stein.

23. Plaintiffs also developed significant relationships with InteCap, Inc., a leading economics and consulting firm focused on intellectual property issues. Throughout the course of events described in this complaint, Plaintiffs were dealing and contracting with InteCap, Inc. to refine and populate underwriting models to enhance the IP Insurance Program and Related IP Insurance Programs (defined *infra*). At all relevant times to this complaint, the defendants were aware of Plaintiffs' relationship and dealings with InteCap, Inc.

24. Also beginning in February 2000 and continuing during Mr. Stein's subsequent discussions with Defendants, Mr. Stein was searching for an insurer or group of insurers to underwrite the IP Insurance Program. As a result of Mr. Stein's marketing efforts, the insurance industry in the United States and London markets in 2000 expressed significant interest in the IP Insurance Program.

25. Throughout most of the year 2000, Mr. Stein, on behalf of IPPI and later IPRR, had discussions with his London insurance market contacts, seeking an insurer or group of insurers that would agree to underwrite the IP Insurance Program. After numerous telephone calls, correspondence and personal visits to London, Mr. Stein commenced negotiations with one of London's leading specialist insurers, Markel Syndicate at Lloyd's of London

("Markel") to whom he was introduced by the Miller Insurance Group ("MIG"), a London insurance brokerage group. During this time frame, Mr. Stein was also introduced by MIG to the two other major intellectual property Lloyd's Syndicate insurers, Hiscox Syndicate 33 ("Hiscox") and Andrew Beazley Syndicate. Each of these three (3) Syndicates at Lloyd's was extremely impressed with the parameters and proprietary aspects of the IP Insurance Program.

26. On March 2, 2000, Mr. Stein and the Harveys met. The purpose of the meeting was for Mr. Stein and the Harveys to discuss IPPI and the potential opportunity for Mr. Harvey's business, VP, to distribute the IP Insurance Program. At that March 2, 2000 meeting, an extremely detailed overview document outlining IPPI's objectives and strategies was delivered by Mr. Stein to all parties in attendance on a confidential basis.

27. Both prior and subsequent to the meeting on March 2, 2000, Mr. Stein had devoted substantial time and expense in developing IPPI's comprehensive Business Plan (the "Business Plan"). To further the discussions between IPPI and the Harveys and their related entities, IPPI agreed to provide Mr. Harvey with a copy of the Business Plan. The Business Plan contained highly sensitive and confidential information regarding IPPI and the IP Insurance Program including, but not limited to, policy limits and parameters, overviews of coverage, components of the policy form, significant exclusions, significant claims' conditions and points of coverage, and program, growth and financial objectives and benchmarks.

28. In light of the highly confidential nature of the information contained in the Business Plan, Mr. Stein insisted that Mr. Harvey execute a Confidentiality Agreement (the "Confidentiality

Agreement") as a condition to receiving a copy of the Business Plan. Mr. Harvey agreed to execute the Confidentiality Agreement, which he executed and dated May 11, 2000. A true and correct copy of the Confidentiality Agreement is attached hereto and incorporated herein as Exhibit "A."

29. The Confidentiality Agreement precluded Mr. Harvey from disclosing or using any information contained in the Agreement:

> It is acknowledged by reader that information to be furnished in this business plan is in all respects confidential in nature, other than information which is in the public domain through other means and that any disclosure or use of same by reader, may cause serious harm or damage to Scott Stein/[IPPI] . Reader hereby acknowledges that they may be subject to legal action for sharing any information in attached plan with any other individual without the express written consent of Scott Stein/[IPPI].
>
> The undersigned reader acknowledges that the information provided by Scott Scott Stein/[IPPI] in this business plan is confidential; therefore, the reader agrees not to disclose it without the express written permission of Scott Stein and [IPPI].

30. Mr. Harvey was provided with a copy of the IPPI Business Plan dated May 18, 2000. After receiving the IPPI Business Plan, Mr. Harvey repeatedly acknowledged to Mr. Stein that the IP Insurance Program, disclosed in the Business Plan and developed by Mr. Stein, was unique.

31. Upon information and belief, and unbeknownst to Mr. Stein, upon reviewing the Business Plan, the Harveys and their related entities embarked on a fraudulent scheme to gain access to, and then convert, the IP Insurance Program for the full use and benefit of Defendants.

32. In furtherance of that scheme, over the course of the next few months, the Harveys repeatedly told Mr. Stein that they were extremely interested in learning about IPPI and ways in which VP, the Harveys and/or the HFP could partner or joint venture with Plaintiffs

to distribute the IP Insurance Program.

33. Additionally, during that same time period, the Harveys began discussing with Mr. Stein the possibility of the Harveys and/or one of their related entities making an equity investment in Mr. Stein's corporation, IPPI.

34. Based upon these discussions, and to facilitate any future relationships with Defendants, Mr. Stein incorporated IPRR and became the sole shareholder thereof in July 2000. It was agreed by the parties that IPRR would succeed to all business opportunities of IPPI and take over all business dealings formerly between IPPI and the rest of the world. In this regard, IPRR acquired all rights, titles, interests and obligations of IPPI and, based upon the agreement of all parties hereto, all previous dealing between the Defendants and IPPI were transferred to IPRR.

35. Unbeknownst to Mr. Stein, the Defendants were not actually interested in pursuing good faith dealings with Plaintiffs and were not dealing with Plaintiffs in good faith. To the contrary, upon information and belief, recognizing the significant profit potential of the IP Insurance Program, the defendants secretly decided to enhance and misuse their confidential relationship with Mr. Stein and IPRR/IPPI in order to wrongfully appropriate the Plaintiffs' ideas, methods, contacts and other property and to steal the IP Insurance Program, Related IP Insurance Programs (defined *infra*), ideas, techniques, methodologies, valuable business contacts/ relationships (hereinafter collectively referred to as "Plaintiffs' Property") for their own use and benefit to the exclusion of Plaintiffs.

36. Upon information and belief, the Defendants conspired together and determined that the best way to appropriate Plaintiffs' Property for their own benefit, was (1) to have the HFP

become a shareholder in IPRR so as to gain the trust and confidence of IPRR and Mr. Stein, gain access to Plaintiffs' Property and to gain some measure of control of IPPR;(2) to agree to have VP partner, joint venture and/or form a licensing/distribution arrangement with IPRR to jointly market and distribute the IP Insurance Programs; (3) to encourage and urge Mr. Stein and IPRR to utilize the valuable contacts/relationships it had or otherwise was developing with major London based Lloyd's Admitted Brokers, including MIG and GlenRand, and London based Lloyd's Syndicates, including Markel and Hiscox, to continue to negotiate for exclusive and semi-exclusive distribution rights in the IP Insurance Program and Related IP Insurance Program it was developing; (4) to have Mr. Stein train and educate the Defendants and VP's personnel and certain of VP's customers and brokers with respect to intellectual property generally and the IP Insurance Program and Related IP Programs specifically; (5) to use Mr. Stein, under the guise of promoting their mutual/joint interests in distributing the IP Insurance Program and the Related IP Insurance Programs (as defined *infra*), to gain entree to, among others, the Lloyd's admitted brokers and syndicates with whom Stein  had and/or was developing and negotiating significant business relationships so that the Defendants could establish their own direct relationships with these parties (including MIG, Hiscox, GlenRand and other London-based Lloyd's Syndicates with whom Mr. Stein was dealing); and (6) to eventually eliminate IPRR's participation in the joint venture and/or licensing/distribution arrangement between IPRR and VP at such time as the Defendants completed their appropriation of Plaintiffs' Property and were assured that IPRR and Stein had exhausted their financial resources to the point where they were unable to take any action, legal or otherwise, to prevent such appropriation.

37. During these negotiations, Defendants repeatedly praised Mr. Stein and expressed excitement and enthusiasm over the inroads Plaintiffs were making in London with insurers with whom Plaintiffs were negotiating to provide underwriting services for the IP Insurance Program.

38. With respect to the equity investment portion of the negotiations, Mr. Stein informed the Defendants that IPRR required that the investor or investors make a commitment to provide up to $300,000 in capital funding.

39. In July 2000, Mr. Harvey, on behalf of the HFP, and Mr. Stein, individually and on behalf of IPRR, agreed that the HFP would provide the required initial funding of up to $300,000 in exchange for a minority equity interest in IPRR. At this time, the HFP advanced $50,000 to IPRR with the balance to be paid pursuant to the terms of a Shareholder Agreement to be negotiated between the parties. As more specifically provided below, the Shareholder Agreement was executed on January 11, 2001 and is attached as Exhibit "B."

40. Throughout the discussions and negotiations leading up to the execution of the Shareholder Agreement, the Harveys understood and repeatedly acknowledged to Mr. Stein that the HFP was prepared and willing to invest up to $300,000 in IPRR during its first year of operations, and that the IP Insurance Program and Related IP Insurance Programs (as defined below) were to remain the exclusive property of IPRR.

41. In or around July 2000, VP, acting through the Harveys, and IPRR, acting through Stein, came to an oral partnership, joint venture and/or licensing agreement to, *inter alia*, promote, distribute and market the IP Insurance Program and any related or derivative program developed by IPRR alone or in conjunction with others including the

insurers/syndicates/brokers with whom IPRR was developing and/or attempting to develop an underwriting relationship (hereinafter referred to as a "Related IP Insurance Program"). For the purpose of simplicity, this relationship is hereinafter referred to as the "VP-IPRR Partnership" and the agreement forming the relationship is referred to as the "VP-IPRR Partnership Agreement." Again, the Harveys assured Plaintiffs that the IP Insurance Program and Related IP Insurance Programs (as defined below) were to remain the exclusive property of IPRR.

42. Pursuant to the VP-IPRR Partnership Agreement, the parties would have the roles defined below. IPRR would be responsible, *inter alia*, for:

A. pre-underwriting submitted applications and risks;

B. overseeing and coordinating the auditing process for submitted applications and risks which survived pre-underwriting;

C. providing access to IPRR contacts, acting as the liaison with these contacts and promoting the IP Insurance Programs to these contacts;

D. training of VP-IPRR Partnership personnel, VP affiliated brokers and third parties (such as Marsh, AON ,Willis, Arthur J. Gallagher, Hilb Rogal, ABD, Barney & Barney, Swett & Crawford, Palmer & Cay and approximately 5,000 other brokers) and third parties in how to sell the IP Insurance Program and Related IP Insurance Programs;

E. communicating with potential customers and their counsel the nature, scope and extent of available coverages, options suitable to the customer and the benefits of the IP Insurance Program and/or Related IP Insurance Programs

specific to the individual customer; and

F. communicating and interfacing with underwriters and their brokers.

VP would be responsible, *inter alia*, for:

A. distribution of the IP Insurance Program and/or Related IP Insurance Programs; and

B. processing all business generated by the VP-IPRR Partnership.

The parties would be jointly responsible, *inter alia*, for:

A. marketing the IP Insurance Program and/or Related IP Insurance Programs; and

B. promoting the IP Insurance Program and/or Related IP Insurance Programs.

43. Throughout the course of the VP-IPRR Partnership, IPRR dutifully performed its obligations under the VP-IPRR Partnership Agreement.

44. Beginning in July 2000 and continuing thereafter, VP and the Harveys repeatedly assured IPRR and Mr. Stein that they were partners and joint venturers in the VP-IPRR Partnership.

45. For the remainder of 2000, the Harveys, the HFP and Mr. Stein negotiated an IPRR Shareholder Agreement.

46. As a direct result of the negotiations commenced in the first half of the year 2000 by Mr. Stein with MIG and Markel, a Related IP Insurance Program was developed for the U.S. and Israeli' insurance markets (the "MIG/Markel Related IP Insurance Program").

47. On October 24, 2000, MIG granted IPRR, *inter alia*, rights to distribute, pre-underwrite and market the MIG/Markel Related IP Insurance Program in Israel.

48. On February 26, 2001, MIG granted IPRR, *inter alia*, rights to distribute, pre-underwrite

and market the MIG/Markel Related IP Insurance Program in the United States.

49. These agreements provided substantial value and credibility to IPRR and Plaintiffs' Property.

50. On or about January 11, 2001, a shareholder agreement was executed by Mr. Stein, the HFP and Mr. Gray (the person who introduced Messrs Stein and Harvey) ("the Shareholder Agreement"). A true and correct copy of the Shareholder Agreement is attached hereto as Exhibit "B". Mr. Harvey signed the Shareholder Agreement as partner of, and on behalf of, the HFP, a general partnership.

51. Pursuant to the Shareholder Agreement, Mr. Stein would have 700 shares of common stock in IPRR, the HFP incrementally acquired a total of 200 shares of common stock for a total investment of $200,000 and Mr. Gray was to acquire 100 shares of common stock, although required payment per the Shareholder Agreement has not been received from Mr. Gray by IPRR for those 100 shares.

52. The Shareholder Agreement contained a number of provisions which effectively precluded IPRR from raising any additional capital from any source without first obtaining the consent of the HFP and Mr. Gray. Those provisions included, without limitation, the grant of preemptive rights, restrictions on issuance or sale of additional shares, and a right of first refusal with respect to the shares owned by the parties to the Shareholder Agreement.

53. The Shareholder Agreement also contained an "Assignment of Invention" clause which provided, in part, as follows:

> [E]ach of the shareholders does hereby transfer all right title and interest to the Corporation in ideas and proprietary data, if any, to certain technology, inventions and devices, as products that have been, or will be, developed, manufactured or sold by the corporation, including, but not limited to, all

> right, title and interest, in any data or other proprietary information or know how related, necessary or useful design, engineering, development, manufacture, sale of said products, or to perfecting patent or trademark rights in and to said products or improvements or modifications thereon.

54. The Shareholder Agreement, signed by Mr. Harvey on behalf of the HFP, also included a covenant designed to protect IPRR's investment, good will and proprietary information by stating that each shareholder, including the HFP:

> [W]ill maintain in confidence and will not disclose or use any proprietary or confidential information or know-how belonging to [IPRR] ("Confidential Information"), whether or not it is in written or permanent form, except to the extent required to perform . . . its duties on behalf of [IPRR]. Such Confidential Information includes, but is not limited to, technical and business information relating to [IPRR's] inventions or products, research and development, production processes, manufacturing and engineering processes, machines, equipment, finances, customers, marketing and production and future business plans. Each shareholder agrees to deliver to the corporation all written and tangible material in his or her possession incorporating the Confidential Information or otherwise relating to the corporation's business.

55. Pursuant to the Shareholder Agreement, the HFP was granted certain options to purchase additional stock in IPRR from Mr. Stein, and the HFP also agreed to provide supplemental mandatory funding to IPRR upon IPRR's request. The Agreement provides in pertinent part:

> After October 1, 2001 HFP grants the right to IPRR to call on HFP for additional investment in IPRR for a period of six months. HFP shall be prepared to purchase from the Corporation [IPRR] an additional 150 shares in IPRR (hereinafter referred to as the "Additional Shares") for the sum of US $100,000.00. Such shares shall be surrendered by Stein to the Corporation and subsequently purchased from the Corporation by HFP within fifteen (15) days from the date of written notice from Stein. Nothing herein shall be deemed or construed to be an option to purchase the Additional Shares as the sale of the Shares upon the terms and conditions specified above shall be within the sole and unfettered discretion of Stein…

56. The Shareholder Agreement further provides that, in return for its investment, the HFP was entitled to appoint one (1) of the three (3) members of IPRR's Board of Directors.

57. Unbeknownst to Mr. Stein, at the time Mr. Harvey executed the Shareholder Agreement, Mr. Harvey did not have honest intentions with respect to the Shareholder Agreement or the VP-IPRR Partnership but rather was entering into these relationships in order to appropriate IPRR's property, connections, insurance programs and other important relationships for Defendants' own sole and exclusive use.

58. Upon obtaining the rights from MIG on October 24, 2000 and February 26, 2001 as discussed in paragraphs 47 to 48 above, IPRR dutifully presented these business opportunities to the VP-IPRR Partnership so that the VP-IPRR Partnership could profit and perform its intended business.

59. As part of the efforts to ramp up the VP-IPRR Partnership in anticipation of the granting of of U.S. rights by MIG in February 2001, the Harveys requested that Mr. Stein provide training to VP's employees on intellectual property, intellectual property insurance, and the unique components of IPRR's IP insurance programs. Relying on the fiduciary/confidential relationship between the parties, Mr. Stein agreed to provide this training.

60. In January 2001, Mr. Stein also provided VP personnel additional written training materials, including a Marketing Guide on the IP Insurance Program and Related IP Insurance Programs. This guide educated VP's employees on how to sell the programs to brokers. This guide, as well as additional training materials, provided VP critical data including, but not limited to, IPRR's marketing, sales, pricing and business practices and methods, IPRR's cost, operating and other management information systems, growth strategies, marketing plans, and target marketing strategies.

61. Throughout 2001, Mr. Stein spent thousands of dollars of IPRR's funds to provide training

to VP and VP's employees. Mr. Stein frequently traveled from Florida to VP's Pennsylvania offices to train VP's employees on intellectual property insurance. Mr. Stein met with numerous VP employees in Philadelphia including, but not limited to, Jim Shaffer, Tara Harvey, Bill Dalton, Joe Dolce and Mary Joan Gardler. This training involved teaching methods for pre-underwriting intellectual property applications submitted under Mr. Stein's IP Insurance Program and Related IP Insurance Programs. Mr. Stein's training served as an invaluable training education to VP personnel on how to screen IP applications and risks.

62. Mr. Stein provided additional training to VP's employees on the telephone and via e-mail. Mr. Stein's extensive training of VP and its employees provided them with superior knowledge in IP underwriting unknown to them prior to such training.

63. To assist VP in the distribution of IP Insurance Programs and the Related IP Insurance Programs, and to further the VP-IPRR Partnership, Mr. Stein specifically provided Tara Harvey, Philip Harvey, Jim Shaffer and William Dalton (all VP employees) with additional extensive mentoring and training in all aspects of the programs. In addition, Mr. Stein entrusted the Defendants with IPRR's trade secrets and confidential information including, without limitation, IPRR's strategic marketing and operations information, tactical information, detailed strategic growth plans and methods.

64. During the period Mr. Stein trained VP and its employees on the IP Insurance Program and the Related IP Insurance Programs, he also made presentations to the industry on his programs. Based on representations by Mr. Harvey, Tara Harvey and VP that VP would act to distribute the programs through the VP-IPPR Partnership, VP requested that Mr. Stein travel and present with VP employees in those presentations and explained VP's and IPRR's

anticipated and defined roles as partners to those in attendance.

65. In attendance were often the world's largest retail insurance brokerages who were VP affiliated retail brokers including Marsh Inc., AON Inc., Willis Inc., Arthur J. Gallagher, Hilb Rogal, ABD, Barney & Barney, Swett & Crawford, and Palmer & Cay among others.

66. In meetings with third parties regarding the IP Insurance Program and the Related IP Insurance Programs, Mr. Harvey often referred to Mr. Stein as "Mr. IP" because of his knowledge of intellectual property insurance, and Mr. Harvey's lack thereof.

67. In February 2001, without the prior knowledge or agreement of IPRR, VP re-branded the MIG/Markel Related IP Insurance Program as "VIP- Venture Intellectual Properties." Mr. Stein questioned Tara Harvey and asked her why VP had re-branded the MIG/Markel Related IP Insurance Program. Ms. Harvey responded that the re-branding was part and parcel with the VP-IPRR Partnership and was merely a marketing device to take advantage of VP's network of brokers.

68. In April 2001, VP began to give its own presentations to third parties regarding the intellectual property programs developed by IPRR. During these presentations, VP developed and used marketing materials specifically identifying VP as a "[d]istributor of product on behalf of IPRR: Intellectual Property Risk Resources."

69. In July 2001, VP created marketing materials which also referred to IPRR and VP collectivley as an "IP Team" and their the VP-IPRR Partnership as their "Management team for intellectual property."

70. During this time frame, VP also developed additional marketing materials, such as brochures, to advertise its relationship with IPRR which state VP was involved in an

intellectual property insurance program "[a]dministered by Venture Programs in conjunction with Intellectual Property Risk Resources, Inc."

71. In or about the summer of 2001, as a result of Mr. Stein's marketing efforts with AON, Inc., AON approached VP to discuss their client, Metro Goldwyn Mayer's ("MGM") need for IP insurance and desire to be insured through the MIG/Markel Related IP Insurance Program now re-branded as VIP- Venture Intellectual Properties.

72. In August 2001, the MGM account was transferred from AON to Marsh. Initially, Marsh continued to work with VP because of the VP-IPRR Partnership, the rights granted to IPRR by MIG and Mr. Stein's prior presentations to Marsh. After some period of time however, Marsh told Tara Harvey that Marsh wanted to broker the account directly with the Lloyds syndicate to increase its commission.

73. Upon information and belief, the defendants unilaterally decided to abandon the promotion of the MIG/Markel Related IP Insurance Program which Plaintiffs had expected would provide substantial income.

74. Accordingly, on or about September 2001, VP, without first informing IPRR, stopped marketing the MIG/Markel Related IP Insurance Program that VP re-branded "VIP- Venture Intellectual Properties". This unilateral action damaged Plaintiffs, deprived them of profits and harmed their reputation, which has continued to the present.

75. At the same time as the parties were dealing with MIG, Mr. Stein and IPRR, with the full knowledge, consent and urging of the Defendants, and using considerable IPRR time and expense and key contacts Mr. Stein had previously developed, began negotiations on behalf of IPRR to develop an exclusive relationship with one of the remaining Lloyd's intellectual

property lead syndicates or related insurers.

76. In that regard, in or about late July 2001, Mr. Stein began negotiating with GlenRand Ltd, London ("GlenRand"), a Lloyd's admitted broker, a further relationship with its client, Hiscox, to develop another Related IP Insurance Program. The intention was to structure a completely exclusive Related IP Insurance Program for distribution by the continuing VP-IPRR Partnership. IPRR was to execute the exclusive contract with Hiscox and GlenRand.

77. Hiscox and GlenRand agreed that Mr. Stein would use his vast experience in the IP market to help modify, develop and refine the Related IP Insurance Program and make it saleable in the United States and would help market the Related IP Insurance Program through various channels including law firms, venture capital firms, accounting firms, the Licensing Executive Society, brokers and direct communications with end user clients. It was also agreed that the VP-IPRR Partnership would promote, market and distribute the Related IP Insurance Program in the United States through its vast broker network.

78. Throughout 2001, Mr. Stein devoted hundreds of hours working in conjunction with Hiscox and GlenRand to develop this Related IP Insurance Program and bring the program to market for distribution by the VP-IPRR Partnership.

79. Mr. Stein, GlenRand and Hiscox agreed that the VP-IPRR Partnership would receive, as a commission from Hiscox, a percentage of all revenue generated in placing IP insurance. The total percentage to be split between the parties was originally 20% but was later negotiated by Mr. Stein up to 25% of which 17.5% would go to the VP-IPRR Partnership.

80. During the time of the negotiations with Glenrand and Hiscox, and to further broaden the

potential of the VP-IPRR Partnership, IPRR began negotiations with domestic United States insurers that may have an interest in underwriting an IP Insurance Program or Related IP Insurance Program. IPRR conducted meetings with domestic insurers for that purpose, some of which were attended by VP personnel.

81. On or about August 29, 2001, Jim Shaffer, (Program manager of IP products and senior underwriter at VP) and Scott Stein wrote, in a letter drafted by Mr. Shaffer, to Ed Williams at GlenRand stating:

> in follow up to Scott Steins' previous e-mail regarding our desired underwriting box for intellectual property insurance through Hiscox, please find a complete outline of our desired program guidelines .... This program will be exclusive to Venture programs, Inc., Intellectual Property Risk Resources, and Intellectual Property Risk Services (a division of GlenRand) all business which meets the above captioned requirements will be required to be sent through this program as follows:



82. On December 5, 2001, Jim Shaffer, on behalf of VP, wrote to Adam McDonough, an independent broker, regarding possible coverage for a client stating that "our partners at IPRR have had a chance to review your submission ," with a copy to Plaintiffs thereby confirming the VP-IPRR Partnership.

83. In early-2002, Philip Harvey, Tara Harvey and other VP personnel participated in telephone conversations with Hiscox and GlenRand. Mr. Stein was deliberately excluded from these phone calls. VP informed Mr. Stein that it was not necessary for him to participate in these calls as they were only regarding the minor marketing items. Upon information and belief, and unbeknownst to Mr. Stein at the time, Mr. Harvey and VP personnel were actually in continued discussions as to ways in which Hiscox could underwrite a policy that Mr. Stein assisted in designing, but was to be administered entirely by VP.

84. Mr. Stein confirmed his understanding of the VP-IPRR Partnership, after being excluded from a telephone call on a purported minor marketing issue, when he wrote to Tara Harvey on January 11, 2002, in part as follows:

> Tara-I sincerely mean this, we are partners. I have NEVER done or communicated one idea or process to anyone in the market-broker/carrier etc that communicate anything other [than] partnership and full coordinated dialogue between Venture and IPRR. I understand both Venture and IPRR's different reasons and needs for standing tall as experts in IP, yet lets decide on it jointly as partners ...

85. As of January 2002, IPRR had expended significant funds marketing the IP Insurance Program and the Related IP Insurance Programs through the VP-IPRR Partnership. In need of additional funds to support IPRR's business operations, Mr. Stein on behalf of IPRR elected to exercise IPRR's right pursuant to the Shareholder Agreement to require the HFP to provide IPRR $100,000 in mandatory supplemental funding. On January 15, 2002, Mr.

Stein, acting on behalf of IPRR, sent a letter to Mr. Harvey requesting that the HFP purchase 150 shares in IPRR for the sum of $100,000, as required in Section 7 of the Shareholder Agreement.

86. As a follow-up to his January 15, 2002 letter, Mr. Stein left a number of voice mail messages for Mr. Harvey and sent a number of letters to Mr. Harvey reiterating his request for this funding to sustain IPRR. Those communications were ignored by Mr. Harvey and the HFP. In late January or early February, Mr. Harvey was advised by Mr. Stein that it was impossible for IPRR to raise capital from any other sources, and that, in any event, the Shareholder Agreement's restrictive provisions would make it exceedingly difficult, if not impossible, to obtain another investor. Mr. Harvey responded to the effect that he did not care what the Shareholder Agreement provided – he was not going to put another dime into IPRR.

87. Unknown to the plaintiffs at the time, VP, the HFP, Philip Harvey and Tara Harvey were persisting in their scheme to defraud IPRR and to force it out of business by the HFP's willful refusal to provide the funding it so desperately required at a time when they knew that IPRR would be unable to obtain such funding from any other sources.

88. Despite HFP's stance, VP and IPRR continued to act as partners in the distribution of the IP Insurance Program and Related IP Insurance Programs. For instance, on January 25, 2002, Peter Roedling from Hiscox wrote to Mr. Harvey about the development of a Related IP Insurance Program, "outlining the various roles of all the parties." Mr. Roedling went on to state that "All references to VP include IPRR" and that the division of labor between VP and IPRR was up to the VP-IPRR partnership to decide. This letter's purpose was "moving the

project forward" and noted that Hiscox thought there was"substantial progress on the policy form and the application." After this letter was sent, VP advised Mr. Stein to be prepared for "kick off" of the program. Moreover, at or around this time, VP continued to forward to Mr. Stein submissions for Related IP Insurance Programs coverage for his pre-underwriting review and analysis. In addition, Mr. Stein was copied on letters sent by VP to third parties submitted requests for coverage which continued to reference IPRR as VP's "partner".

89. On or about February 12, 2002, Mr. Stein and IPRR sent a letter to Mr. Harvey and the HFP declaring them in breach of their obligations under the Shareholder Agreement.

90. In early March, 2002, Mr. Stein, with the consent of the Defendants, arranged for a second meeting with Hiscox and GlenRand representatives at VP's offices in West Chester, Pennsylvania, to finalize the distribution of Mr. Stein's IP Insurance Program and/or Related IP Insurance Program. Mr. Stein was told by Defendants the Friday afternoon prior to the Monday morning meeting, that it would be imprudent for him to participate unless Mr. Stein was willing to sign and overnight mail the originals of numerous documents presented to him that afternoon by Mr. Harvey's counsel. The documents presented by Mr. Harvey's counsel required Mr. Stein to forfeit his Shareholder Agreement right to call upon the HFP for the supplemental funding to IPRR. The proposed documents also contained multiple hold harmless agreements and other releases. Mr. Stein refused to sign such releases and amendments to the Shareholder Agreement in order to attend the meeting at VP's offices.

91. When Mr. Stein became aware of this conduct, he contacted Mr. Harvey who responded that Mr. Stein was not wanted at the meeting. It was only much later, in January 2003, that Mr. Stein learned that VP began dealing directly with Hiscox in order to further Defendants

scheme to convert Plaintiffs' Property.

92. On April 2, 2002, Mr. Roedling wrote to Mr. Stein reaffirming Hiscox's belief that it was dealing with VP and IPRR jointly stating that "The combination of Venture Programs as the insurance market experts and IPRR [] as IP specific resources was close to a perfect model. I purposely considered the IPRR roles as being in conjunction with Venture."

93. On April 26, 2002, Tara Harvey initiated a teleconference between Mr. Stein, herself and Philip Harvey. Ms. Harvey started the conversation by stating, *inter alia*, that VP wanted to work with Mr. Stein and IPRR on the Related IP Insurance Program. In this conversation, Mr. Harvey further stated, *inter alia*, words to the effect that he wanted to move forward as partners or he would drop the IP initiative and look at it as a bad investment on his part.

94. On May 31, 2002, Mr. Harvey formally responded, on behalf of the HFP, to Mr. Stein's request for supplemental funding and February 12, 2002 notice of breach. Mr. Harvey refused to provide the required $100,000, and instead, offered Mr. Stein $35,000 on the condition that IPRR and Mr. Stein agree to release Mr. Harvey, the HFP and VP of any liability. Mr. Stein swiftly rejected this proposal.

95. On June 5, 2002, Mr. Harvey, in a further attempt to lull Plaintiffs into a false sense of confidence and security as to the Defendants intentions and actions, wrote to Mr. Stein and stated "I do agree that it is vital that we immediately use our best efforts to work out a mutually acceptable arrangement between VP and IPRR for going forward with VIP Defender. I wish to have IPRR as a 50% partner of Venture ... I want IPRR to be a full partner of Venture's on this product ... The only equitable arrangement is one where both VP and IPRR are full partners from an investment (expenses) and profitability standpoint."

96. In January 2002 and continuing through at least July 2002, Mr. Stein continued to believe, based on the earlier assurances of Mr. Harvey and VP, as well as discussions with GlenRand and Hiscox, that VP intended to distribute the Related IP Insurance Program pursuant to the VP-IPRR Partnership Agreement, that this specific program would be exclusively underwritten by Hiscox, and that the "launch date" of the programs was imminent.

97. For instance, there was numerous correspondence through at least July 2002 between the parties and third parties which referred to the VP-IPRR Partnership.

98. However, commencing in the summer of 2002, the communications between Plaintiffs and defendants completely stopped and Plaintiff was shut out of any further discussions with the Defendants concerning moving the VP-IPRR Partnership forward. By August 2002, Plaintiffs hired Duane Morris, LLP due to the deteriorating situation.

99. Upon information and belief, since about January 1, 2003, VP has been marketing, distributing and administering the IP Insurance Program and/or Related IP Insurance Programs developed by Plaintiffs through Plaintiffs relationships under the name "VIP-Defender." The product marketed under the name VIP-Defender also incorporates all proprietary aspects of IP Insurance Program and Related IP Insurance Programs including risk assessment and categorization. The VIP-Defender product insures the same products, provides the same levels of coverage and targets the same business classes as targeted by the Related IP Insurance Program being negotiated between IPRR, Hiscox and GlenRand and further paralleled the IP Insurance Program developed by Plaintiffs and confidentially shared by plaintiffs with defendants. Moreover, much of the policy form used for the VIP Defender product was developed to a large degree by and through the efforts of Mr. Stein and IPRR.

It was only upon the release of the VIP Defender product in January 2003 that Plaintiffs realized the fraud engaged in by the Defendants.

100. Marketing materials issued by VP to the public regarding the "VIP-Defender" product trumpet the "partnership with Hiscox" and the "unique coverage" offered by the program. On information and belief, VP is acting as a wholesale product distributor/program distributor for Hiscox pursuant to a wrongfully obtained exclusive wholesale distribution agreement.

101. VP is, on information and belief, working with in excess of five thousand (5000) retail brokers throughout the United States to market the IP Insurance Program and/or Related IP Insurance Programs. On information and belief, VP has received, and will continue to receive, submissions from retail brokers including, but not limited to, Marsh Inc., Willis Inc., Arthur Gallagher & Co. and Hilb Rogal Hamilton Inc., among others, for a program which, although called VIP-Defender, is, in fact, Plaintiffs' IP Insurance Program and/or Related IP Insurance Programs.

102. Upon information and belief, VP has in fact been selling VIP-Defender and have bound policy(ies) for cover and profited therefrom without remunerating or sharing profits with Plaintiffs.

103. At all relevant times to the this Complaint, the defendants had various duties to disclose material facts to the Plaintiffs which duty was breached by the defendants.

104. At all relevant times to this Complaint, the Plaintiffs reasonably relied upon the actions, statements and perceived good faith of the defendants to the plaintiffs' detriment.

**COUNT I**
**BREACH OF CONTRACT AND/OR**
**QUASI CONTRACT AND/OR IMPLIED CONTRACT**
**THE VP-IPRR PARTNERSHIP AGREEMENT**
**AGAINST VP**

105. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

106. Commencing in or about July 2000, VP and IPRR entered into a partnership, joint venture and/or licensing agreement referred to in this Complaint as the VP-IPRR Partnership Agreement. In the alternative, the course of conduct between the parties establishes a quasi contractual relationship or an implied contract, implied in law and/or in fact, between VP and IPRR.

107. Each party owed a fiduciary duty to the other including the duties to faithfully execute the VP-IPRR Partnership Agreement, quasi contract or implied contract and to protect the interests of the other.

108. As set forth *supra*, VP breached the VP-IPRR Partnership Agreement, quasi contract or implied contract.

109. IPRR has been damaged by VP's willful breaches and has been deprived of, *inter alia*, the benefits of the contract, quasi contract or implied contract between the parties including, but not limited to the value of its property, services, lost profits and lost business opportunities.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant VP for compensatory and punitive damages in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees, and any other relief that this Court deems appropriate.

**COUNT II**
**PROMISSORY ESTOPPEL - DETRIMENTAL RELIANCE**
**SECTION 90 OF THE RESTATEMENT (SECOND) CONTRACTS**
**AGAINST ALL DEFENDANTS**

110. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

111. Defendants made various promises through the course of the parties dealings which the defendants reasonably expected would induce action and/or forbearance on the part of the Plaintiffs.

112. Plaintiffs reasonably relied upon the defendants' promises and were in fact induced into action and/or forbearance of action based upon those promises.

113. Injustice has occurred and Plaintiffs have been injured by the Defendants actions.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant VP for compensatory and punitive damages in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees, and any other relief that this Court deems appropriate.

**COUNT III**
**FRAUDULENT INDUCEMENT AGAINST**
**AGAINST ALL DEFENDANTS**

114. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

115. As set forth above, from 2000 through 2002, the Harveys, the HFP and VP made countless misrepresentations in order to induce Plaintiffs to, *inter alia*, disclose confidential information and trade secrets regarding Plaintiffs' Property, to acquire an equity interest in

IPRR, and to enter into the VP-IPRR Partnership Agreement, Confidentiality and Shareholder Agreements.

116. At the time the Defendants made each of the aforesaid misrepresentations and omissions, they did so with the intention that IPPI, IPRR and Mr. Stein be induced to act, and Mr. Stein, IPRR and IPPI reasonably relied upon the aforesaid misrepresentations and failures to disclose by the Defendants by, inter alia, providing confidential information and trade secrets regarding the Plaintiffs' Property, entering into the Confidentiality and Shareholder Agreements, entering into the VP-IPRR Partnership, and allowing the HFP to gain an equity interest in IPRR.

117. At the time the defendants made each of the aforesaid misrepresentations, they did so knowing that they were false.

118. The defendants made these misrepresentations intentionally, willfully, maliciously, outrageously and in bad faith.

119. As a direct and proximate cause of the false statements and omissions of the Defendants, Plaintiffs have suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants jointly and severally for compensatory damages in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees, and any other relief that this Court deems appropriate.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY/CONFIDENTIAL RELATIONSHIP**
**AGAINST ALL DEFENDANTS**

120. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

121. At all relevant times, the defendants purported to act in a fiduciary and/or confidential capacity causing plaintiffs to trust and rely upon the defendants' good faith and fidelity,

122. The relationship between Plaintiffs and VP, the HFP and the Harveys was one of trust and confidence, involving a special and confidential relationship. Plaintiffs reposed trust and confidence in the defendants who owed Plaintiffs fiduciary duties based upon their confidential relationships.

123. In addition, as shareholders of a closely-held corporation, each member of the HFP, including Philip and Tara Harvey, owed fiduciary duties towards IPRR including, but not limited to, the duties of loyalty and to communicate.

124. The defendants exercised influence and superiority over Mr. Stein and IPRR as a result of their representations and promises set forth above, and intentionally failed to act with the utmost good faith and scrupulous honesty toward IPRR and Mr. Stein.

125. The defendants breached their fiduciary duties owed to IPRR and Mr. Stein by, *inter alia*, their wrongful conduct, misrepresentations, omissions and failures to disclose as set forth above. The defendants breached their fiduciary duties as a result of their involvement in the theft of Plaintiffs Property, interference with contractual relations between plaintiffs and third parties, including Hiscox and GlenRand, usurpation of corporate opportunity, breach of the VP-IPRR joint venture/partnership agreement and breach of the confidentiality

agreement executed by Mr. Harvey.

126. As a direct and proximate cause of the fiduciary duties breached by defendants, Plaintiffs have suffered and will continue to suffer substantial damages.

127. Such conduct by the defendants was grossly reckless, intentional and/or malicious as well as outrageous.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants Philip Harvey, Tara Harvey, the HFP and VP, jointly and severally, for compensatory damages in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees, and any other relief that this Court deems appropriate.

**COUNT V**
**BREACH OF THE SHAREHOLDER**
**AGREEMENT AGAINST THE HFP**

128. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

129. On or about January 11, 2001, IPRR, Mr. Stein and the HFP entered into a valid and binding Shareholder Agreement.

130. Pursuant to the Shareholder Agreement, the HFP agreed not to engage in certain unfair and competitive acts against IPRR and from using IPRR's confidential or proprietary information in a manner that could be harmful to IPRR.

131. Pursuant to the Shareholder Agreement, the HFP also agreed to provide certain supplemental and mandatory funding to IPRR upon IPRR's request.

132. By engaging in the fraudulent scheme described herein, and refusing to provide the supplemental and mandatory funding to IPRR upon IPRR's request, the HFP breached the

Shareholder Agreement.

133. At all relevant times hereto, Mr. Stein and IPRR fulfilled all of their obligations, duties and responsibilities under the Shareholder Agreement.

134. As a direct and proximate result, Mr. Stein and IPRR have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs Mr. Stein and IPRR respectfully request that this Court enter judgment in their favor and against Defendant the HFP for compensatory damages in excess of $75,000.00, as well as interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT VI**
**BREACH OF THE**
**CONFIDENTIALITY AGREEMENT AGAINST MR. HARVEY**

135. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

136. On or about May 11, 2000, IPPI, Mr. Stein and Mr. Harvey entered into a valid and binding Confidentiality Agreement. By agreement of the parties, this agreement later enured to the benefit of IPRR.

137. Mr. Harvey breached the Confidentiality Agreement by, converting Plaintiffs' Property and using and disclosing Plaintiffs' confidential information including, but not limited to the information contained in the IPPI Business Plan to, among others, VP.

138. At all relevant times hereto, Plaintiffs fulfilled all of their obligations, duties and responsibilities under the Confidentiality Agreement.

139. As a direct and proximate result, Plaintiffs have suffered and will continue to suffer

damages.

WHEREFORE, Plaintiffs Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Mr. Harvey for compensatory and punitive damages in excess of $75,000.00, as well as interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT VII**
**UNFAIR COMPETITION-MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION**
**AGAINST ALL DEFENDANTS**

140. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

141. The books and records of IPRR, the confidential information contained therein, the IPPI business plan, the IP Insurance Program, the Related IP Insurance Programs and other documents and information of Plaintiffs are confidential, proprietary and are trade secrets.

142. This information collectively derives independent economic value by not being accessible, through proper means, to competitors such as Defendants who can and are profiting from its explicit use and disclosure. Moreover, the combination of the elements of the IP Insurance Program and Related IP Insurance Programs, including the policy forms developed by IPRR, the breadth of coverage offered by the IP Insurance Program and Related IP Insurance Program, IPRR's approach towards analyzing policy claims, and the training materials developed by IPRR regarding the analysis of applications for coverage and claims made, inter alia, are trade secrets.

143. Plaintiffs have taken reasonable measures under the circumstances to maintain the secrecy

of this information.

144. Defendants have used, disclosed or otherwise misappropriated confidential and trade secret information of Plaintiffs.

145. Plaintiffs invested significant time, effort and money in developing their confidential and trade secret information.

146. Such trade secrets and confidential information constitute valuable information not available to others through public sources and are important business advantages accruing to Plaintiffs in the conduct of their business thereby entitling Plaintiffs to the use and enjoyment of its property.

147. The actions of defendants, jointly and severally, constitute unfair competition by misappropriation of a trade secrets and confidential information, the Plaintiffs' Porperty revealed in confidence to defendants which has been used by the defendants to the exclusion of Plaintiffs in breach of that confidence without Plaintiffs' consent, and to the detriment of Plaintiffs.

148. Defendants' use, disclosure and/or misappropriation of IPRR's confidential and trade secret information, breaches of fiduciary duty, deliberate and intentional violation of the contractual obligations owed by Defendants, and fraudulent schemes result in their commission of acts of unfair competition.

149. Defendants' acts of actual unfair competition are without justification, are being committed through improper means, and have proximately caused injury to Plaintiffs.

150. The Defendants' conduct was reckless, intentional, and/or malicious as well as outrageous.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor

and against Philip Harvey, Tara Harvey VP and the HFP, jointly and severally, for compensatory and punitive damages in excess of $75,000.00, as well as interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT VIII**
**CONVERSION AGAINST ALL DEFENDANTS**

151. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

152. The defendants intentionally misappropriated Plaintiffs' Property created by Mr. Stein for their own use.

153. The defendants acted with an intent to exercise dominion or control over Plaintiffs Property which was inconsistent with Defendants' rights.

154. As a result of the Defendants' conduct, Plaintiffs were deprived of their right of property in, use or possession of its assets.

155. As a result of the Defendants' conduct, Mr. Stein was fraudulently induced to contribute his creations including the IP Insurance Program and Related IP Insurance Programs to IPRR and then to create a joint venture or Partnership with VP. Plaintiffs were deprived of their right of property in, use or possession of their assets.

156. The defendants acted without Plaintiffs' consent and without lawful justification.

157. Such unauthorized and intentional dominion and use by the defendants of Plaintiffs' Property constitutes conversion.

158. Plaintiffs have been injured as a direct and proximate result of the Defendants' conversion.

159. The Defendants' use and conversion of Plaintiffs' Property has been intentional, willful, malicious, outrageous and done in bad faith.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against the Defendants jointly and severally, for compensatory damages in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH**
**EXISTING AND PROSPECTIVE CONTRACT**
**AGAINST PHILIP HARVEY, TARA HARVEY, THE HFP AND VP**

160. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

161. As described herein, Mr. Stein and IPRR had contractual relations and prospective contractual relations with MIG and Hiscox.

162. The Plaintiffs also had contractual relations and prospective contractual relations with other third parties including but not limited to InteCap, Inc., an international economics based consulting firm focusing on issues related to intellectual property.

163. The Harveys, the HFP and VP were aware of these contractual relations and prospective contractual relations.

164. By engaging in the fraudulent scheme described herein, the defendants acted purposefully and with the specific intent of harming these existing and prospective contractual relations which have in fact been harmed.

165. The Defendants acted in the absence of privilege or justification.

166. Plaintiffs have been injured by the defendants conduct.

WHEREFORE, Plaintiffs Mr. Stein and IPRR respectfully request that this Court enter judgment in their favor against the Defendants, jointly and severally, for compensatory damages

in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT X**
**CIVIL CONSPIRACY AGAINST**
**PHILIP HARVEY, TARA HARVEY, VP AND THE HFP**

167. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

168. Philip Harvey, Tara Harvey, VP and the HFP combined, associated, agreed, acted in concert together and entered into a conspiracy for the purpose of willfully and maliciously injuring Plaintiffs in their trade, business, and profession and misappropriating/converting Plaintiffs Property by engaging in the conduct described in this Complaint.

169. As a direct and proximate result of the conspiracy, Plaintiffs have suffered and will continued to suffer damages and harm.

WHEREFORE, Plaintiffs Stein and IPRR respectfully request that this Court enter judgment in their favor against the Defendants, jointly and severally, for compensatory damages in an amount in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT XI**
**QUANTUM MERUIT AGAINST**
**PHILIP HARVEY, TARA HARVEY VP AND THE HFP**

170. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

171. In or around the year 2001, the Harveys requested that Mr. Stein provide training to VP's

employees on intellectual property, intellectual property insurance and the unique components of the IP Insurance Program and Related IP Insurance Programs. Relying upon the representations by the Harveys and VP that VP and IPRR were partners and/or joint venturers and that IPRR and/or Mr. Stein would be paid to provide these training services, Mr. Stein agreed to provide the training to VP's employees.

172. Mr. Stein spent thousands of dollars of IPRR's funds to provide training to VP and VP's employees. Mr. Stein frequently traveled from Florida to VP's Pennsylvania offices to train VP's employees on intellectual property insurance. Mr. Stein's training involved teaching methods for pre-underwriting intellectual property applications submitted under Mr. Stein's IP insurance programs. Mr. Stein's training served as an invaluable training education to VP personnel on how to screen IP applications and risks.

173. Mr. Stein also provided additional training to VP's employees on the telephone and via e-mail, and in meetings with national and local insurance broker retailers throughout the United States. Mr. Stein's extensive training of VP and its employees provided them with superior knowledge in IP underwriting unknown to them prior to such training.

174. In January 2001, with the knowledge of the Defendants, Mr. Stein provided VP personnel with additional written training materials. These materials included a Marketing Guide on the IPRR IP insurance program. This training guide educated VP's employees on how to sell IP insurance to brokers, including suggested sales approaches and IP language. This Guide, as well as additional training materials, provided VP critical data including, but not limited to, IPRR's marketing, sales, pricing and business practices and methods, IPRR's cost, operating and other management information systems, growth strategies, marketing

plans, and target marketing strategies.

175. At the request of the defendants, and in anticipation of sharing profits, Mr. Stein pursued further relationships with underwriters to create Related IP Insurance Programs to be co-marketed and distributed by VP and IPRR.

176. Based on representations by Mr. Harvey and VP that VP would act to distribute the programs, VP requested that Mr. Stein travel and present with VP employees presentations made to the insurance industry on his programs.

177. In mid-2001, based on VP's representations, the Harveys and VP requested Mr. Stein to assist in VP's marketing efforts. Mr. Stein agreed and did assist these Defendants in marketing the insurance programs.

178. Mr. Stein provided training and marketing services to Mr. Harvey, VP and the HFP with the reasonable expectation that at the time he performed these services he would receive payment for services rendered.

179. Mr. Harvey, VP and the HFP did not compensate or pay Mr. Stein for the extensive services he performed in connection with creating new product, training and marketing the insurance programs.

180. By acting with the specific intent of inducing Mr. Stein to create Related IP Insurance Programs, provide training and marketing services, the Harveys, VP and the HFP received a benefit without payment. In doing so, these Defendants are liable to Mr. Stein for reasonable compensation for services rendered by him.

WHEREFORE, Plaintiffs Stein and IPRR respectfully request that this Court enter judgment in their favor against Defendants Philip Harvey, Tara Harvey, the HFP and VP, jointly and severally,

for compensatory damages in an amount in excess of $75,000.00, as well as punitive damages, interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT XII**
**UNJUST ENRICHMENT AGAINST**
**PHILIP HARVEY, TARA HARVEY VP AND THE HFP**

181. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

182. The actions of the defendants as aforesaid caused the defendants, jointly and severally, to be unjustly enriched through the usurping of Plaintiffs' Property.

WHEREFORE, Plaintiffs demand judgment against all of the defendants, jointly and severally, in an amount in excess of $75,000.00 dollars for compensatory and punitive damages, interest, the costs of this action, reasonable attorney's fees and any other relief that this Court deems appropriate.

**COUNT XIII**
**PLAINTIFFS VS. ALL DEFENDANTS**
**RESTITUTION PURSUANT TO SECTION 136 OF THE**
**RESTATEMENT OF RESTITUTION**

183. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

184. The defendants, acting jointly and severally, have tortiously used Plaintiffs' Property, confidential information and trade secrets owned by or developed by the Plaintiffs as aforesaid and have a duty of restitution for the value of the benefit they have and will receive therefrom.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, in an amount for the value of the benefit that the defendants have and will receive from their tortious use of Plaintiffs' Property, confidential information and trade secrets developed by the plaintiff as aforesaid.

**COUNT XIV**
**PLAINTIFFS VS. ALL DEFENDANTS**
**BREACH OF TRUST - CONSTRUCTIVE TRUST -TRUSTEE EX-MALIFICIO**

185. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

186. The transfer of Plaintiffs' Property to the Defendants as aforedescribed was induced by fraud and/or undue influence exerted by the defendants, jointly and severally, and as such, the Defendants hold said property in a constructive trust for the benefit of the Plaintiffs pursuant to Section 166 of the Restatement of Restitution.

187. Defendants, jointly and severally, are also trustees and/or trustees ex malificio for the Plaintiff, of the Plaintiffs' Property as aforesaid. Said rights of the Plaintiffs arise, inter alia, pursuant to Section 190 of the Restatement of Restitution.

188. The Defendants, jointly and severally, have violated their duties to the Plaintiffs and have caused a breach of trust(s) resulting in economic loss to the Plaintiffs as aforedescribed.

WHEREFORE, Plaintiffs asks the Court to impose a constructive trust over the proceeds deriving from Plaintiffs' Property, to compel the Defendants to make an accounting to Plaintiffs for such proceeds, to declare the Defendants as trustees ex-malificio, and to enter judgment in their favor and against defendants, jointly and severally, in an amount in excess of $75,000.00 dollars, for punitive and compensatory damages.

**COUNT XV**
**ACCOUNTING**
**PLAINTIFFS VS. ALL DEFENDANTS**

189. Plaintiffs incorporate the foregoing paragraphs of the Complaint as if fully set forth herein at length.

190. The Defendants, jointly and severally, have appropriated for their own use Plaintiffs' Property, in derogation of the rights of the Plaintiffs, and should provide an accounting to the plaintiff for all economic activity which they have engaged in pertaining to the marketing and/or sale of Plaintiffs' Property including but not limited to the IP Insurance Program and Related IP Insurance Programs.

WHEREFORE, Plaintiffs demand that this Court order the Defendants, jointly and severally, to account to the Plaintiffs for all economic activity in which they have engaged pertaining to their use of Plaintiffs' Property.

______________________________
NEIL E. JOKELSON, ESQUIRE
Attorney I.D. #02486
DAVID E. JOKELSON, ESQUIRE
Attorney I.D. #73734
DEREK E. JOKELSON, ESQUIRE
Attorney I.D. #81047
Neil E. Jokelson & Assocs., P.C.
230 South Broad Street, 18th Floor
Philadelphia, PA 19102
(215) 735-7556